The UNITED STATES, Appellant,

v.

A. JOHNSON & CO., INC., Appellee.

Appeal No. 78–11; C.A.D. No. 1218.

United States Court of Customs
and Patent Appeals.

Dec. 7, 1978.

Barbara Allen Babcock, Asst. Atty. Gen., David M. Cohen, Chief, Customs Section, Washington, D. C., Joseph I. Liebman, New York City, for the United States.

Rivkin, Sherman & Levy, New York City, attorneys of record, for appellee; Joseph S. Kaplan, Dorothy P. Watson, New York City, of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

RICH, Judge.

This appeal by the United States is from the judgment of the United States Customs Court, 450 F.Supp. 247, 80 Cust.Ct. ——, C.D. 4737 (1978), upon remand from our prior decision reported at 559 F.2d 16, 64 CCPA 164, C.A.D. 1196 (1977), sustaining the importer's alternative classification. We reverse.

The merchandise in issue is described in our earlier opinion, 559 F.2d at 17, 64 CCPA at 165:

The imported merchandise is invoiced, inter alia, as "Mairon Electrolytic Iron Flake," "Mairon" being a proprietary name by which we shall hereinafter identify the merchandise imported. Mairon is produced from a solid, zinc-ore residue by reducing the iron content thereof to molten pig iron, casting the pig iron to form an iron anode, and electrolyzing the anode in an electrolytic cell having a stainless steel cathode. During electrolysis, the relatively impure iron anode is dissolved and its iron content is plated out in highly pure form on the cathode. The pure iron plating is removed from the cathode and physically broken up to produce Mairon, an iron product of more than 99.9% purity in the form of flat, irregular fragments generally less than two inches across and about one-fifth of an inch thick. Mairon's high purity makes it particularly useful in alloying applications employing vacuum or other melting techniques which do not permit further purification.

The "Mairon" flake was exported from Japan in 1969 and 1970 and was classified in liquidation under item 657.20 of the Tariff Schedules of the United States (TSUS), as modified by T.D. 68–9, as other articles of iron dutiable, depending on date of entry, at either 13 or 15 percent ad valorem. On remand below, Johnson successfully contended that the "Mairon" is classifiable under the TSUS ultimate basket provision, item 799.00, and not under item 657.20 as contended by the Government.

### Statutory Provisions

The relevant statutory provisions read:

Tariff Schedules of the United States

SCHEDULE 6.—METALS AND METAL PRODUCTS

\* \* \* \* \* \* \* \*

PART 2.—METALS, THEIR ALLOYS, AND THEIR BASIC SHAPES AND FORMS

\* \* \* \* \* \* \* \*

Subpart B.—Iron or Steel

Subpart B headnotes:

1. This subpart covers iron and steel, their alloys, and their so-called basic shapes and forms \* \* \*.

\* \* \* \* \* \* \* \*

Classified and urged by the United States:

PART 3.—METAL PRODUCTS

\* \* \* \* \* \* \* \*

Subpart G.—Metal Products Not Specifically Provided For

Subpart G headnotes:

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

\* \* \* \* \* \* \* \*

Articles of .iron or steel, not coated or plated with precious metal:

\* \* \* \* \* \* \* \*

Other articles:

\* \* \* \* \* \* \* \*

657.20    Other . . . . . . . . . . . . . . 15% ad val.
(for merchandise imported in 1969); 13% ad val. (for merchandise imported in 1970).

Claimed and held below:

SCHEDULE 7.—SPECIFIED PRODUCTS: MISCELLANEOUS AND OTHER NONENUMERATED PRODUCTS

\* \* \* \* \* \* \* \*

PART 14.—NONENUMERATED PRODUCTS

Any article, not provided for elsewhere in these schedules:

\* \* \* \* \* \* \* \*

799.00    Other . . . . . . . . . . . . . . 8% ad val.
(for merchandise imported in 1969); 7% ad val. (for merchandise imported in 1970).

## Proceedings Below

This appeal brings these same parties before us for the second time concerning the issue of proper classification for the subject merchandise. On the first occasion, *United States v. A. Johnson & Co.*, 559 F.2d 16, 64 CCPA 164, C.A.D. 1196 (1977), we reversed the decision of the Customs Court, 417 F.Supp. 1026, 76 Cust.Ct. 155, C.D. 4650 (1976), which had held the merchandise classifiable under the chemicals schedule of TSUS in item 415.50, as modified by T.D. 68–9, and remanded the case for determination of the merits of any unadjudicated claimed classification. In the original action before the Customs Court, the importer had alternatively argued for classification under the ultimate basket provision of

TSUS, item 799.00. Without permitting the parties to provide additional briefing on the issue,[1] the Customs Court considered that claim upon remand and decided in favor of. the importer, holding the merchandise properly classifiable under item 799.00.

In explanation of its holding, the court relied on the findings in the earlier action, stating that:

In C.D. 4650 this court rejected classification of the imported merchandise under item 657.20 because the imported iron fragments are not *articles of iron* as they of necessity would have to be in order to be classifiable in Part 3 of Schedule 6 of the TSUS. The court found the merchandise to be iron in a primary form although not provided for in that particular form in Part 2 of Schedule 6 of the TSUS. In this court's view neither of these findings was disturbed by the holding of our appellate court in C.A.D. 1196.

\* \* \*

\* \* \* \* \* \*

The court continues to believe in the soundness of its previous findings in C.D. 4650 concerning the primary nature of the imported iron fragments. Moreover, if Congress had intended. to deal specifically with electrolytic iron in the TSUS there is persuasive evidence in the legislative history of the TSUS of Congress' awareness (1) of the commercial existence of electrolytic iron, and (2) of the treatment of that material as a primary form of metal under a tariff classification system said to have been relied upon by the framers of the TSUS in the "arrangement of the proposed revised schedules". See *Explanatory Notes to the Brussels Nomenclature* (1955), page 662, where, under the heading 73.06 dealing, among other things, with blocks, lumps and simi-

1. Both parties claim to have requested permission to file supplemental briefs on remand. The Customs Court declined to receive any additional briefs, observing that:

Inasmuch as the appellate remand was for *determination* of the unadjudicated claim rather than for *further proceedings* in the case this court is disposing of the alternative

claim on the basis of the existing record which the court regards as being sufficient for such purposes, as did apparently the Court of Customs and Patent Appeals. [450 F.Supp. at 247, 80 Cust.Ct. at ——, emphasis in original.]

The record now before us is entirely adequate to decide this case.

lar forms of iron or steel, it is stated, "This includes electrolytic iron produced in any form and broken into pieces and imported as such"; and compare this with the definition of *"unwrought"* contained in Headnote 3(a) of Part 2 of Schedule 6 of the TSUS wherein that term is defined as "the term *'unwrought'* refers to metal, whether or not refined, in the form of * * * blocks, lumps * * and similar primary forms * * *".

Thus, since the iron fragments at bar are unquestionably a primary form of iron which does not respond to the tariff concept of *articles of iron*, and cannot, under the law of this case, be classified under the chemicals schedule, it follows that this merchandise is classifiable as alternatively claimed.by the plaintiff under the residual provision in item 799.00 for articles not provided for elsewhere in these schedules, and the court so holds. [450 F.Supp. at 248, 80 Cust.Ct. at ——, footnote omitted, emphasis in original.]

### Appellant's Arguments

The Government argues that the Customs Court erred in finding that "Mairon" is insufficiently advanced in form to qualify as an "article of iron" within the meaning of item 657.20. The assertion is that the word "article," as used in that provision, is broad enough to include basic materials and no clear evidence of a legislative intent exists to limit its scope. Appellant also calls attention to the presumption of correctness of the Government's original classification, and in this respect, appears to question whether the Customs Court gave any weight to the presumption.[2]

2. The Customs Court stated that "this presumption must, in the court's opinion, be measured against the unadjudicated claim under item 799.00." 450 F.Supp. at 247, 80 Cust.Ct. at ——. We think it beyond question that, in light of this statement, the Customs Court gave proper weight to the presumption of correctness. The court held that it had been overcome.

3. *See*, e. g., TSUS General Headnote 1. We also note that at the top of each page in the TSUS the word "article" appears above the

### OPINION

The resolution of this case depends on the meaning of the word "article" as it appears in TSUS item 657.20. This word is used extensively throughout TSUS. In some instances it is used as a synonym for "thing" and embraces any importation,[3] and in other contexts it takes on a narrower meaning such as that urged here by appellee, namely, a manufactured thing or product.[4] Part 14 of Schedule 7, containing the claimed classification, provides for "any *article*, not provided for elsewhere in these schedules." (Emphasis ours.) Part 3, Subpart G, of Schedule 6, containing the classification assigned upon liquidation, and urged here by appellant, provides for "*articles* of iron" (emphasis ours). Unless the meanings of the word "article[s]," as it is used in the above quotations, are different, the claim of appellee, successful below, must fail. See *Lussky, White & Coolidge, Inc. v. United States*, 21 CCPA 201, T.D. 46727 (1933). If "article" has the same meaning in items 657.20 and 799.00, the importation is most specifically described by the former, which identifies its component material. TSUS General Headnote 10(c) would then be controlling. It reads in pertinent part:

> 10. *General Interpretative Rules* —For the purposes of these schedules—
>
> * * * * * *
>
> (c) an imported article which is described in two or more provisions of the schedules *is classifiable in the provision which most specifically describes it* * * *. [Emphasis ours.]

column identifying the various importations there listed.

4. One example of the use of "articles" in a narrower sense appears in the superior heading to TSUS items 533.11 to 533.77:

> Articles chiefly used for the preparing, serving, or storing food or beverages, or food or beverage ingredients:

It is clear from the context that "article" is here used to refer to manufactured products as opposed to basic forms or raw materials.

■ The burden of proof in classification cases is on the importer. 28 U.S.C. § 2635 (1977). It is a dual burden of proving that the assigned classification was erroneous and that the claimed classification is correct. *Hayes-Sammons Chemical Co. v. United States*, 55 CCPA 69, C.A.D. 935 (1968); *Atlantic Aluminum & Metal Distributers, Inc. v. United States*, 47 CCPA 88, C.A.D. 735 (1960). Here the burden is on appellee to show that Congress intended a narrow meaning to apply to the use of the word "articles" in TSUS item 657.20. This burden has not been met.

The argument of appellee is based almost entirely on its analysis of Schedule 6, the metals schedule of TSUS. Its contention is that Congress organized Schedule 6 in an orderly manner, evidenced by its division into parts according to the degree of advancement of the metal.[5] Appellee's assertion is that this fact, together than an examination of the predecessor to item 657.-20,[6] mandate that headnote 1 of Subpart B of Part 2 of Schedule 6—that iron itself and the so-called basic shapes and forms of iron are covered therein—be taken literally and that these basic forms should not be classified together with the metal products described in Part 3. Since "Mairon" flake is a basic form of iron,[7] appellee claims that it cannot be classified under Part 3 of Schedule 6 in item 657.20, leaving item 799.00 as the only possible classification.

■ While we are in general agreement with the observations of appellee and the Customs Court concerning the organization of Schedule 6, we cannot agree with their conclusions. Appellee would have us resolve a dispute over a *metal* importation by denying it classification in the *metals schedule* of TSUS in favor of inclusion in a nonenumerated basket (indeed, the basket of baskets) provision. One of the purposes of TSUS is to deemphasize the importance and restrict the scope of basket provisions.[8] *United States Tariff Commission Tariff Classification Study Submitting Report*, part II(E)(4), at 15–16 (1960); *American Express Co. v. United States*, 290 F.Supp. 778, 61 Cust.Ct. 207, 213, C.D. 3573 (1968), aff'd, 426 F.2d 383, 57 CCPA 100, C.A.D. 985 (1970).

■ Furthermore, with regard to Schedule 6, the metals schedule, TSUS was an attempt to *comprehensively* cover metals and metal products. The *Tariff Classification Study* is an aid in determining legislative intent. *Rifkin Textiles Corp. v. United States*, 54 CCPA 138, C.A.D. 925 (1967), cert. denied, 389 U.S. 931, 88 S.Ct. 294, 19 L.Ed.2d 283 (1967). According to the *Tariff Classification Study*:

Despite the importance of metals and metal products, the existing provisions therefor are disorganized, fragmentary, and in major respects of uncertain application with the result that they are involved in many classification disputes and

---

**5.** Schedule 6 is arranged as follows:
 Part
 1 Metal-Bearing Ores and Other Metal-Bearing Materials.
 2 Metals, Their Alloys, and Their Basic Shapes and Forms
 3 Metal Products
 4 Machinery and Mechanical Equipment
 5 Electrical Machinery and Equipment
 6 Transportation Equipment

**6.** The predecessor to item 657.20 is Paragraph 397 of the Tariff Act of 1930. It was the basket clause in the metals schedule of that act.

**7.** In the original action before the Customs Court, the court decided that "Mairon" is a basic or primary form of iron. 417 F.Supp. at 1028, 76 Cust.Ct. at 156. We do not think this can be seriously disputed.

**8.** If we were to follow appellee's urging, and place this importation in the ultimate basket of TSUS, we would seriously undermine this purpose of TSUS. As appellee itself points out, Paragraph 397 of the Tariff Act of 1930, note 6 supra, "had come to incorporate such a hodgepodge of tariff classifications that it took no less than 219 separate TSUS item descriptions to sort them out." (*See Tariff Classification Study*, Schedule 6 (1960) at 132, 232–33, 291, 317, 331). We fail to see how our acting to create a similar hodge-podge of tariff classifications in TSUS item 799.00 would serve any purpose other than to create new problems such as those which caused the overhaul of the Tariff Act of 1930.

litigation. *The existing* provisions have been assimilated into Schedule 6 in an orderly, systematic manner. [*Id.*, Schedule 6—Metals and Metal Products, Explanatory Notes, at 2 (1960), emphasis ours.]

The message is clear; the intent was to classify *all* metals in the same place in order to avoid the problems encountered under the Tariff Act of 1930. The plan to cover all metals in Schedule 6 is controlling over any subsidiary plan to give order to the items by subdivision of that schedule. To read the word "article" in the manner suggested by appellee would surely defeat this intent.

■ The *Tariff Classification Study* is useful for the purpose of resolving questions relating to the meaning and scope of terms appearing in TSUS as well as in determining the intent of Congress. *Rifkin Textiles Corp. v. United States*, supra.. The explanatory notes to Part 3 of Schedule 6 in the *Tariff Classification Study* shed some light on the present controversy. In explaining the breadth of Schedule 6, Part 3, the *Study* says (at 174):

> This part is divided into seven subparts each of the first five of which treat with more or less related *products*, the sixth of which deals with miscellaneous metal *products*, and the last of which covers *articles* of metal not specially provided for. [Emphasis ours.]

Thus a difference was seen between "products" and "articles" by the drafters of TSUS.[9]

■ Appellee argues that Congress did not intend basic shapes and forms to be classified with products and advanced forms. This argument is unavailing. While this arrangement is generally followed, examination of Schedule 6 shows that basic forms are found in Part 3, while some fairly advanced forms are found in Part 2.[10] In any event, this supposed intent of Congress is derived from examination of the titles of parts and subparts of Schedule 6, contrary to the prohibition found in General Interpretative Rule 10(b).[11]

■ In view of the foregoing, we do not find that the word "article," as used in TSUS item 657.20, has such a narrow meaning that the "Mairon" flake cannot be properly included therein. Accordingly, item 657.20 and not item 799.00 most specifically describes the subject importation, and application of General Headnote 10(c) requires that the "Mairon" flake be classified under item 657.20 TSUS as modified by T.D. 68–9. The judgment of the Customs Court is *reversed.*

**9.** In this regard, we note that the superior heading to TSUS items 607.01–607.04 recites "Iron or steel *products*," and indicates that products may be found in Part 2, Subpart B, contrary to appellee's statement in its brief that *"Part 3* enumerates *products* and advanced forms *exclusively."* [Emphasis ours.] See note 10 infra.

**10.** Some fairly advanced forms of iron may be classified in Part 2, Subpart B of Schedule 6, including coated or plated flat wire (items 609.-25–609.27), round wire (items 609.40–609.45), steel pipe (items 610.30–610.52), pipe and tube fittings (items 610.62–610.81). As appellant indicates, such forms are at least as advanced as steel shavings (item 652.45) and steel wool (item 652.50) which are found in Part 3 of Schedule 6. This court, in *Commercial Shearing & Stamping Co. v. United States*, 464 F.2d 1048, 59 CCPA 203, C.A.D. 1067 (1972), held a fabricated pressure tank head classifiable in Part 2, Subpart B of Schedule 6.

**11.** Rule 10(b) states:
For the purposes of these schedules—
\*   \*   \*   \*   \*   \*
(b) the titles of the various schedules, parts, and subparts and the footnotes therein are intended for convenience in reference only *and have no legal or interpretative significance.* [Emphasis ours.]